JOHN W. HUBER, United States Attorney (#7226)
KARIN M. FOJTIK, Assistant United States Attorney (#7527)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:15cr368 |
| Plaintiff, | |
| | RESPONSE TO MOTION TO RECONSIDER |
| vs. | |
| MILLARD LONKEY | |
| | Judge David Nuffer |
| Defendant. | |

The United States of America, by and through the undersigned, files this response to Mr.

Lonkey's motion to reconsider.

### I. Factual Background

In June 2015, Mr. Lonkey traveled to Utah and agreed to pay to have sex with a nine-year-

old female child. (Doc. 1, 16). In 2015 this Court imposed a sentence of 168 months followed by

60 months of supervised release. (Doc. 21).

On March 9, 2020, Mr. Lonkey filed a petition for compassionate release alleging that he

had medical conditions that required his release. (Doc. 27). He filed with his petition documents

contending he had presented this petition to the Warden at the Big Springs BOP facility. (Doc. 27-

1).

The United States opposed this petition contending that Mr. Lonkey had not demonstrated that he had exhausted his administrative remedies. (Doc. 29).

This Court denied Mr. Lonkey's petition on the merits of his contentions. (Doc. 33). In that denial this Court accepted Mr. Lonkey's representation that he had presented his claims to the warden. (Doc. 33

The undersigned reached out to counsel for the BOP after this Court's ruling. Counsel for the BOP confirmed that it had no record of Mr. Lonkey presenting a petition for relief to the warden in January, 2020.   In Mr. Lonkey's original pleading, Mr. Lonkey appeared to file an email he sent through the Court's "Trulinc" system. (Doc. 27-1). Notably, in the heading of that email, Mr. Lonkey left the "To" section of the email blank. (Doc. 27-1).

On April 6, 2020, Mr. Lonkey filed a rebuttal contending he had not emailed his petition to the warden, but instead contending that he had sent the letter to the warden via certified mail. (Doc. 34).  He provided no copy of a receipt for this letter nor a return of any certified letter. (Doc. 34).

In Mr. Lonkey's current petition, he now contends he sent a certified letter on both April 3, 2020 and April 14, 2020.  (Doc. 35, 35-1).  He has filed not copy of any receipt for any certified letters sent with his current pleading.

The undersigned reached out to BOP counsel today to determine if a certified letter has been received by the Big Springs Facility  recently, and, if so, the timing of any such letter.

As of today's date, no COVID-19 cases have been found at the BOP Big Springs, Texas facility. https://www.bop.gov/coronavirus/

I.	*Court's Authority to Consider Motion*

This Court should deny Mr. Lonkey's current motion for reconsideration as untimely and because he has not met his burden of proof to establish he presented his petition to the warden.

Further, even if Mr. Lonkey has presented a new petition in the last few weeks as he contends, the BOP has not had the required 30 days to review his petition.

The Federal Bureau of Prisons is actively working on the critical problem of containing the spread of the coronavirus within prisons. BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, begun providing masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act. This last step carries special importance for defendant's request for compassionate release.

Before the CARES Act was passed, § 3624(c)(2) provided the "Bureau of Prisons" with the exclusive authority to "place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." Congress has now, temporarily, expanded this provision, while leaving its application to BOP. As part of the CARES Act, Congress sought to address the spread of the coronavirus in prison by permitting BOP to expand the use home confinement under § 3624(c)(2). Section 12003(b)(2) suspends, during the emergency of the coronavirus pandemic, the limitation in § 3624(c)(2) that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, once the Attorney General makes requisite finding that emergency conditions will materially affect the function of BOP.[1] The Attorney General made those findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement.

---

[1] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

Since March 26, 2020, BOP has placed at least an additional 615 inmates on home

confinement (*see* https://www.bop.gov/coronavirus/index.jsp), focusing on, among other factors,

the vulnerability of the inmates, the prisons most at risk, and the dangers posed by the inmates if

release.[2]

---

[2] BOP has described its increased use of home confinement on its website:
https://www.bop.gov/resources/news/20200405_COVID19_home_confinement.jsp

"In response to COVID-19, the Bureau of Prisons (BOP) has instituted a comprehensive
management approach that includes screening, testing, appropriate treatment, prevention,
education, and infection control measures.

The BOP has increased Home Confinement by over 40% since March and is continuing to
aggressively screen all potential inmates for Home Confinement.  On April 3, the Attorney
General exercised emergency authority under the CARES Act, to further increase Home
Confinement.

Given the surge in positive cases at select sites and in response to the Attorney General's
directives, the BOP has begun immediately reviewing all inmates who have COVID-19 risk
factors, as described by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI
Danbury, FCI Elkton and similarly-situated facilities to determine which inmates are suitable for
home confinement.

**Inmates do not need to apply to be considered for home confinement.**  Case management
staff are urgently reviewing all inmates to determine which ones meet the criteria established by
the Attorney General.  The Department has also increased resources to review and make
appropriate determinations as soon as possible.

While all inmates are being reviewed for suitability, any inmate who believes they are eligible
may request to be referred to Home Confinement and provide a release plan to their Case
Manager.  The BOP may contact family members to gather needed information when making
decisions concerning Home Confinement placement.

Since the release of Attorney General Barr's original memo to the Bureau of Prisons on March
26, 2020 instructing us to prioritize home confinement as an appropriate response to the COVID-
19 pandemic, the BOP has placed an additional 566 inmates on home confinement.  There are
currently 3,419 inmate on home confinement and 7,199 inmates in Residential Reentry Centers
(RRCs).  To further assist inmates in pre-release custody, the BOP has waived financial
requirement to pay subsistence fees.

BOP's releases of inmates to home confinement must take into account, among other

factors, whether a home is available where the inmate could be confined, whether the inmate

could receive appropriate food and medical care there, the comparative risk to the inmate in

home confinement in the identified location versus remaining in prison, the inmate's risk to the

public through recidivism, and the availability of supervision during home confinement or risk to

the public if supervision is lacking.  BOP also seeks to ensure that the inmates it releases to home

confinement are not already ill and therefore spreading infection to others—including spreading

illness to the individuals who would be needed to make home confinement successful.  To help

accomplish that goal, BOP is requiring a 14-day period of quarantine before any inmate is

released to home confinement.  By having BOP control the 14-day period of quarantine—rather

than leaving inmates to conduct their own quarantines after release—BOP can ensure the

effectiveness of the quarantine and evaluate the appropriateness of any determination that the

inmate is not a carrier of the coronavirus.

In addition to these efforts to increase the use of home confinement under 18 U.S.C.

§ 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act, BOP is continuing to accept and

review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A).

Under the present circumstances, the request for the 30-day window allows the BOP to

address the individual inmate's claims. The BOP is better positioned than courts to:

---

We are deeply concerned for the health and welfare of those inmates who are entrusted to our
care, and for our staff, their families, and the communities we live and work in.  It is our highest
priority to continue to do everything we can to mitigate the spread of COVID-19 in our facilities.

The BOP appreciates the dedication and significant work of BOP staff in carrying out their
difficult mission in the face of the public emergency.  The BOP would also like to thank the
Attorney General, the CDC, the Public Health Service, and our state and local community
partners for their support and assistance in the BOP's COVID-19 response."

- determine whether an inmate's proposed place to go after release from prison is a place where no person is infected or soon to be infected;

- evaluate with the stretched resources of BOP and the Probation Office whether the place where a defendant would go after release from prison is suitable in enabling a defendant to avoid reoffending and returning to prison—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points,

  https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12;

- assure that an inmate who is presently incarcerated is not infected by the time that the Court ordered any release, undermining the benefits of the release;

- evaluate whether a released inmate could find—during a pandemic—food, medical care, and safe (often interstate) transportation needed to relocate from prison to the inmate's home;

- balance how likely an inmate's release will improve his health prospects against the likelihood that continued incarceration would affect the same inmate's health;

- determine accurately, *with appropriate records,* how great a danger the inmate poses to the public and make that determination on a time scale needed to respond to disease transmission within a prison; and

- compare the improvement in prison conditions and risk to the public of this inmate's release versus releasing another inmate who could use the resources available for post-imprisonment supervision.

This list is not exhaustive and, indeed, could include many additional considerations. Allowing the BOP to consider an inmate's petition first provides a practical and legal starting point for the evaluation of petitions for compassionate release.

### A. Mr. Lonkey has failed to provide BOP with the required 30-day period to evaluate his request for compassionate release because of COVID-19.

Under § 3582(c)(1)(A), Mr. Lonkey cannot obtain relief from this Court until he establishes that the BOP has been given 30 days to evaluate his motion.

The Third Circuit recently confirmed that where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, __F.3d__, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020). The plain language of § 3582(c)(1)(A) confirms the Third Circuit's conclusion in *Raia*, and this Court should follow that ruling.

The compassionate release statute provides, in pertinent part:

The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . .

18 U.S.C. § 3582(c)(1)(A). The requirement that a defendant establish that he has exhausted administrative appeals or waited 30 days after presenting a request to the warden before seeking judicial relief is mandatory and must be enforced by the Court.

The requirement of a 30-day period for review by BOP is jurisdictional, but because the United States is asserting the requirement here, it does not make a difference whether the rule is

jurisdictional or not. The rule is at a minimum a mandatory claims-processing rule, requiring a court to enforce the rule when it is invoked even if it is not jurisdictional.

"'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances." *Dillon v. United States*, 560 U.S. 817, 825 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only pursuant to express statutory authorization. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979). As the Fourth Circuit has explained, § 3582(c) "states that a district court 'may not modify a term of imprisonment once it has been imposed' unless the Bureau of Prisons moves for a reduction, the Sentencing Commission amends the applicable Guidelines range, or another statute or Rule 35 *expressly* permits the court to do so." *United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010). "[T]here is no 'inherent authority' for a district court to modify a sentence as it pleases." *Id*. (quoting *United States v. Cunningham*, 554 F.3d 703, 708 (7th Cir. 2009)); *see also United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Section 3582(c)(1)(A) speaks directly in terms of a court's adjudicatory power and says "[t]he court may not modify a term of imprisonment once it has been imposed except" in the circumstances enumerated in § 3582(c). Section 3582(c)(1)(A) thus "speak[s] to the power of

the court rather than to the rights or obligations of the parties," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (citation omitted), delineating "when, and under what conditions," a court may exercise its "'adjudicatory authority,'" *Bowles v. Russell*, 551 U.S. 205, 212-13 (2007) (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam)). That conclusion is reinforced by the legal backdrop against which § 3582(c) was enacted. At common law a court could not modify a final judgment in a criminal case after the expiration of the court term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970). After the Federal Rules of Criminal Procedure prescribed a specific window of time during which a court could modify a criminal sentence, the Supreme Court continued to treat these time limits as jurisdictional. *See United States v. Smith*, 331 U.S. 469, 473 n. 2 (1947); *Addonizio*, 442 U.S. at 189 n.17. Section 3582(c) accordingly has been understood as conferring the jurisdictional authority that previously was lacking by providing express statutory authorization to modify otherwise final sentences.[3]

In recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be non-jurisdictional absent a clear statement to the contrary. *See Fort Bend County*

---

[3] A number of courts have recognized that the prerequisites for relief under Section 3582(c)(2), which allows a sentence reduction based on a retroactive guideline amendment, are jurisdictional. *See, e.g.*, *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010); *United States v. Williams*, 607 F.3d 1123, 1125-26 (6th Cir. 2010); *United States v. Auman*, 8 F.3d 1268, 1271 (8th Cir. 1993); *United States v. Austin*, 676 F.3d 924, 930 (9th Cir. 2012), *overruled on other grounds by United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016); *United States v. Graham*, 704 F.3d 1275, 1279 (10th Cir. 2013); *United States v. Mills*, 613 F.3d 1070, 1078 (11th Cir. 2010); *see also United States v. Higgs*, 504 F.3d 456 (3d Cir. 2007) (canvassing history of judicial treatment of Rule 35 as jurisdictional and holding that Rule 35(a) and Section 3582(c)(1)(B) remain jurisdictional after *Bowles*). Other courts disagree. *See, e.g.*, *United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013); *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015).

*v. Davis*, 139 S. Ct. 1843, 1848-50 (2019).  A prescription is not jurisdictional merely because "it

'promotes important congressional objectives,'" *id*. at 1851 (quoting *Reed Elsevier, Inc. v.*

*Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that

"seek to promote the orderly progress of litigation by requiring that the parties take certain

procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).

But whether a prescription is jurisdictional turns on Congress's intent, which is properly

determined by the text, context, relevant historical treatment, and purpose of the provision.

*Henderson*, 562 U.S. at 436.  Here, the relevant factors indicate that § 3582(c) sets forth a

jurisdictional limitation on a district court's authority to modify a sentence, such that a district

court lacks jurisdiction to consider a motion for compassionate release where the defendant has

failed to establish that he satisfied the exhaustion requirement of Section 3582(c)(1)(A).[4]

While the United States maintains that the time limitation in Section 3582(c)(1)(A) is

jurisdictional, given that it stands as an exception to the historic and fundamental rule that courts

may not revisit a final criminal judgment, the point is ultimately academic here.  Even if the

exhaustion requirement of § 3582(c)(1)(A) were not jurisdictional, it is at least a mandatory

claim-processing rule and must be enforced if a party "properly raise[s]" it.  *Eberhart*, 546 U.S.

at 19 (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within

14 days of the verdict, is a nonjurisdictional but mandatory claim-processing rule).  The

government raises the rule here, and it must be enforced.[5]

---

[4]   Although we use the term "exhaustion requirement," to be clear, an inmate need not
"exhaust" administrative remedies if the motion is filed in court 30 days after receipt of a request
by the warden.  If the BOP rejects the request or takes no action within the 30 day window, the
inmate is then free to press his position in the appropriate federal court.

[5]   Indeed, even those courts that have concluded that the requirements of
Section 3582(c)(2) are not jurisdictional still enforce the statutory prerequisites to relief.  *See,
e.g.*, *Taylor*, 778 F.3d at 670 (recognizing that even if a court has the "power to adjudicate" a

The Supreme Court recently reaffirmed that principle in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in which the Court rejected a judicially created "special circumstances" exception to the exhaustion requirement stated in the Prison Litigation Reform Act of 1995 (PLRA). That Act mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a). Rejecting the "freewheeling approach" adopted by some courts of appeals, under which some prisoners were permitted to pursue litigation even when they had failed to exhaust available administrative remedies, *Ross*, 136 S. Ct. at 1855, the Court demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances, *id.* at 1856. The Court stated:

> No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions. *See McKart v. United States*, 395 U.S. 185, 193 (1969) ("The doctrine of exhaustion of administrative remedies . . . is, like most judicial doctrines, subject to numerous exceptions"). But a statutory exhaustion provision stands on a different footing. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.

*Id.* at 1857.

Section 3582(c)(1)(A) permits a motion to the Court only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."[6]

---

motion under Section 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met") (emphasis in original).

[6] Unlike the exhaustion provision in *Ross*, which required only exhaustion of "available" administrative remedies, 136 S. Ct. at 1858, the compassionate release statute contains no such exception.

Some have suggested that the exhaustion requirement of § 3582(c)(1)(A) may be excused by a court as "futile" during the present pandemic.  However, there is no "futility" exception, as the Supreme Court has made clear that courts have no authority to invent an exception to a statutory exhaustion requirement.  Thus, in *United States v. Perez*, -- F. Supp. 3d --, 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020), the court incorrectly excused exhaustion of a claim based on COVID-19 as "futile," relying only on *Washington v. Barr*, 925 F.3d 109, 118 (2d Cir. 2019), which addressed only a judicially created exhaustion requirement.[7]  And in any event, a request in this context is not futile, because, as explained further below, BOP fully considers requests for compassionate release.  Indeed, BOP often concurs with such requests.  During the period from the passage of the First Step Act on December 21, 2018, until mid-March 2020 (before the coronavirus crisis began), BOP consented to a reduction in sentence in 55 cases.

The requirement of a 30-day period to afford BOP the initial review of the defendant's request therefore cannot be excused.  While Congress acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement of initial resort to administrative remedies.  And this is for good reason:  The Bureau of Prisons conducts an extensive assessment for such requests.  *See* 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), available at

https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  As the Procedures reflect, the Bureau

---

[7] To the extent *Perez* also suggests that *Mathews v. Eldridge*, 424 U.S. 319 (1976), supports an exception to the exhaustion requirement here, *see* 2020 WL 1546422, at \*2 n.2, that is incorrect.  In *Eldridge*, the claimant complied with the "nonwaivable and nonexcusable requirement that an individual present a claim to the agency before raising it in court." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 16 (2000).  And while the Court in *Eldridge* recognized that a constitutional challenge "entirely collateral to [the claimant's] substantive claim of entitlement" might evade a statutory exhaustion requirement, 424 U.S. at 330, the defendant's claim for relief in this Court is the same claim he was required to present to BOP.

of Prisons completes a thorough review, with its expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

This remains true in the present crisis, and the United States does not underplay the defendant's concerns. This Court, like all citizens, is aware of the dangers that COVID-19 poses. The virus has infected large numbers of people and caused many deaths in a short period of time. BOP has accordingly taken significant measures in an effort to protect the health of the inmates in its charge. BOP began planning for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control (CDC), including by reviewing guidance from the World Health Organization (WHO). On March 13, 2010, BOP announced that it was implementing the Coronavirus (COVID 19) Phase Two Action Plan ("Action Plan") in order to minimize the risk of coronavirus transmission into and inside its facilities. The Action Plan comprises many preventive and mitigation measures, including the following: all incoming inmates are screened, and staff are regularly screened; contractor visits are limited to essential services, while nearly all attorney, social, and volunteer visits have been suspended; inmate movements between facilities have been extremely limited; and institutions are taking additional steps to modify operations to maximize social distancing. BOP has taken further steps as events require, including confining all inmates to their living quarters for a 14-day period beginning on April 1, 2020, in order to mitigate any spread of the disease. Many additional details are available at the BOP website, www.bop.gov.

BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular

facilities.  The provision of Section 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time.  As the Third Circuit stated, "[g]iven BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance."  *Raia*, 2020 WL 1647922, at \*2.  Thus, even if this Court could ignore the mandatory exhaustion requirement, which it cannot, it would be prudent for courts to confirm that BOP has had an opportunity to engage in a meaningful review.

### B.  *BOP's Coronavirus Response*

In addition to prioritizing home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act, BOP has taken a number of steps to prioritize the health and safety of inmates.  In February 2020, BOP "began planning for its COVID-19 response and instituted a comprehensive management approach for oversight of the situation" that "includes all BOP Regional Offices, all BOP Central Office Divisions (which oversee program level functions), and the National Institute of Corrections (NIC) that coordinates with state and local prisons and jails."  BOP's COVID-19 Response, https://www.bop.gov/coronavirus/overview.jsp#bop_covid-19_response (last accessed April 8, 2020).  Along with implementing "its approved Pandemic Influenza Plan," BOP is "utilizing the guidance and directives from the World Health Organization (WHO), the Centers for Disease Control (CDC), the Office of Personnel Management (OP), DOJ and the Office of the Vice President."  *Id.*  Like many other government agencies, BOP is conducting "daily briefings and provid[ing] updates to senior management" to implement evolving guidance on matters including "inmate and staff screening tools," "CDC best practices," and "BOP's Personal Protective Equipment (PPE) inventory."  *Id.*  Regarding PPE, BOP has completed review of its infectious disease supplies and is executing "[a] national acquisition plan … to obtain bulk purchase, stockpile supplies and coordinate distribution."  *Id.*

BOP has also implemented a modified operations plan to mitigate the spread of Covid-19. https://www.bop.gov/coronavirus/covid19_status.jsp. Under this plan, all social visits and inmate internal movements have been suspended, with the exception of movements required by the federal judicial system or needed to maintain the health and safety of inmates by, for example, limiting overcrowding. *Id.* In-person legal visits have been temporarily suspended, with allowances for confidential legal calls. *Id.* Inmates have also been given an additional 500 telephone minutes per calendar month to facilitate safe social contact. *Id.* BOP has implemented screening measures for staff, inmates, and contractors performing essential services and maintenance and has adopted a "modified operations plan to maximize social distancing in [its] facilities, as much as practicable." *Id.* For example, modified operations can included staggered meal and recreation times designed "to limit congregate gatherings." *Id.* BOP has also suspended all non-essential staff training and all staff travel, excepting relocation travel. *Id.*

BOP is monitoring and reporting daily on Covid-19 cases identified in its facilities. COVID-19 Cases, https://www.bop.gov/coronavirus/index.jsp (updated daily at 3:00 p.m.) (last visited April 8, 2020). As of April 8, 2020, 253 inmates and 84 staff members at 34 facilities and 7 residential re-entry centers in 24 states have tested positive for Covid-19. *Id.* Eight inmates have died. *Id.* These numbers do not include inmates participating in the Federal Location Monitoring program. *Id.*

BOP has implemented protective measures and, through increased use of home confinement and continued evaluation of compassionate release, is actively seeking to remove the most vulnerable and least dangerous to safer alternative settings. Regardless of whether a particular inmate is released under these programs, BOP's efforts to curb the spread of disease

serve to protect the health of all federal inmates to the extent possible amid this current health crisis.

## *CONCLUSION*

The United States respectfully asks the Court to deny defendant's Motion for Reconsideration because he has not met his burden to establish he provided notice to the warden of his petition, and, even if he has provided such notice recently, the mandated 30-days for the BOP to review his petition has not expired.

Respectfully submitted this 29th day of April, 2020.

*Karin M. Fojtik*

Karin M. Fojtik
Assistant United States Attorney